KJ

AO 91 (REV.5/85) Criminal Complaint

AUSA Erika Csicsila (312) 353-5370

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

JUN 1 0 2009
Jun 10 2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

OSCAR NAVARRO and
DIEGO VILLAREAL

**CRIMINAL COMPLAINT**

CASE NUMBER: **09 CR 501**

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief.  Starting no later than on or about June 8, 2009 and continuing to the present, at Cook County, in the Northern District of Illinois, Eastern Division, OSCAR NAVARRO and DIEGO VILLAREAL, defendants herein

conspired with each other and with others known and unknown to knowingly and intentionally poses with intent to distribute and to distribute a controlled substance, namely in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotics Drug Controlled Substance,

in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.  I further state that I am a Special Agent with the Drug Enforcement Administration ("DEA") and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
ANTHONY ANGLADA
Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

June 10, 2009
Date

at  Chicago, Illinois
City and State

GERALDINE SOAT BROWN, Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS  )
                           )
COUNTY OF COOK  )

## AFFIDAVIT

I, Anthony Anglada, Special Agent, Drug Enforcement Administration (hereinafter, "DEA"), being duly sworn, states as follows:

1.     I am a Special Agent with the DEA and have been so employed for over twelve years. I have received specialized training in narcotics and dangerous drug investigations while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including, but not limited to, visual surveillance, general questioning of witnesses, use of search warrants, informant and cooperating witness debriefings, and document analysis. I have been personally involved in investigations of controlled substances-related offenses involving the possession, sale, and distribution of cocaine in the Chicago metropolitan area, and investigations involving distribution of these substances by drug trafficking organizations.

2.     The information in this Affidavit is drawn from interviews of cooperating sources; information obtained from consensual recordings; physical surveillance; information received from other law enforcement agents; my experience and training; and the experience of other agents. As part of my current assignment, I have investigated criminal violations of the Controlled Substance Act as found in Title 21 of the United States Code, as well as related violations found in Title 18 of the United States Code. Based on my training and experience, I am familiar with the ways in which individuals conduct their drug-related business, including, but not limited to their: (a) methods of distributing narcotics; (b) use of telephone communication devices; and (c) use of code words to identify themselves and the nature of the communication.

3.     Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint charging OSCAR NAVARRO ("NAVARRO") and DIEGO VILLAREAL ("VILLAREAL") with violations of Title 21, United States Code, Section 846, it does not contain all the information known to me concerning this investigation.

### FACTS SUPPORTING PROBABLE CAUSE

4.     The investigation into the narcotics trafficking activities of NAVARRO and VILLAREAL was initiated based upon information from a confidential source (hereinafter "CS1"). In or about approximately late May 2009, CS1 was approached by DEA regarding suspected narcotics trafficking in the Chicago area. CS1 subsequently began cooperating with DEA, with the expectation that he/she would be paid for any assistance he/she provided to law enforcement. Based upon current information, CS1 has a 2004 DUOS conviction and a 2007 retail theft conviction, and is also an illegal alien. According to CS1, he/she has known NAVARRO since childhood and is aware that he is involved in the distribution of illegal narcotics. The information provided by CS1 has been independently corroborated by physical surveillance, consensual recordings, and information received from other law enforcement officers.

5.     In or about the afternoon of June 8, 2009, CS1 placed a telephone call to NAVARRO. This telephone call was recorded. During the conversation, CS1 and NAVARRO agreed to meet later that day at Extreme Tires and Rims, in Lansing, Illinois, to discuss a potential narcotics transaction.

6.     Prior to CS1 meeting with NAVARRO later that afternoon, law enforcement met with CS1 at a prearranged meet location. Additionally, in order to facilitate the meeting with

-2-

NAVARRO, law enforcement decided to introduce another confidential source (hereinafter "CS2")[1], to act as the purported buyer of the cocaine that CS1 anticipated purchasing from NAVARRO. Law enforcement called CS2 and instructed him/her to also come to the prearranged meet location. At the location, CS1, CS2, and CS2's vehicle were searched for contraband and narcotics with negative results. CS1 was also provided with a concealed audio recorder to capture the conversation with NAVARRO and any potential co-conspirators. CS1 and CS2 then departed the prearranged meet location and drove in CS2's vehicle, while under constant surveillance, to Extreme Tires and Rims.

6.     At approximately 3 p.m., law enforcement officers conducting surveillance (hereinafter "surveillance") saw CS1 and CS2 arrive at Extreme Tires and Rims. Once they arrived at the shop, surveillance observed CS1 go into the store. Shortly thereafter, surveillance saw CS1 and NAVARRO come out of the store and walk toward and then get into CS2's car. According to CS1, after he/she and NAVARRO got into the car, CS1 introduced CS2 as the buyer of the cocaine to be purchased from NAVARRO. While in CS2's car, the three individuals discussed CS2 purchasing approximately three kilograms of cocaine from NAVARRO at a price of approximately $31,000 per kilogram. CS1 told NAVARRO, "I want it [cocaine] every week, depending on the price and the quality."[2] NAVARRO responded to CS1, saying, "The girl [a kilogram of cocaine] ...

---

[1] CS2 was arrested by DEA on charges of participating in a narcotics conspiracy in the Chicago area. Following his/her arrest, CS2 agreed to cooperate with DEA in an effort to receive consideration in charging and sentencing decisions that will be made in connection with his/her case. CS2 has not been paid for his/her cooperation. CS2 also has a four prior convictions for narcotics offenses. The information provided by CS2 has been independently corroborated by physical surveillance, consensual recordings, and information received from other law enforcement officers.

[2] To the extent I refer to or provide interpretation for the contents of consensually recorded conversations in this affidavit, I am basing that on a review of the conversations, which were in Spanish and summarized in English by a Spanish speaker, my training, and experience,

is 32 [$32,000]." CS1 told NAVARRO that the price was "very high," and that he wanted "at least

three." NAVARRO told CS1 that he would "have them [three kilograms of cocaine] here tomorrow

if you want." CS1 told NAVARRO, "But I want a better price." NAVARRO offered, "Try these

three and I guarantee you that you won't regret it." CS1 asked NAVARRO, "31 [$31,000]?" to

which NAVARRO responded, "31 [$31,000]." During that conversation, NAVARRO also stated,

"It's better [to do the transaction] over there by J Penny's or Macy's [located at the River Oaks Mall

in Calumet City, Illinois]." CS1 told NAVARRO that he/she prefers that the transaction take place

where there are "a lot of people." NAVARRO agreed. CS1 and NAVARRO then agreed to meet

at 1 p.m. on Wednesday, June 10, 2009, in the Macy's parking lot. NAVARRO, according to CS1,

also provided CS2 with his telephone number. NAVARRO then left CS2's car and went back into

the store.

7.     Following the meeting with NAVARRO, CS1 and CS2 left Extreme Tires and Rims.

CS2's car was surveilled without interruption as CS2 drove to the pre-determined location to meet

with law enforcement. At that time, CS1, CS2, and CS2's vehicle were again searched for drugs,

money, or contraband, with negative results.

8.     On or about June 9, 2009, at approximately 11:00 a.m., CS2 placed a telephone call

to NAVARRO. That telephone call was not recorded. During their conversation, according to CS2,

CS2 informed NAVARRO that he/she would not be able to complete the narcotics transaction on

June 10, 2009, but that he/she could do the transaction later that day. According to CS2,

NAVARRO indicated that he could go forward with a two kilogram transaction later that same

---

and my knowledge of this investigation as a whole. The transcripts of those conversations are in
draft form and are not intended to be final transcripts.

afternoon.

9.      At approximately 2:00 p.m. that afternoon, CS1 placed a telephone call to NAVARRO. That telephone call was not recorded, but took place in the presence of agents who were able to hear CS1's side of the conversation. During their conversation, CS1 told NAVARRO that his "money guy" (meaning CS2) was ready to purchase two kilograms of cocaine from NAVARRO. In addition, according to CS1, CS1 and NAVARRO agreed that the transaction would take place at approximately 2:30 p.m. at the Macy's department store parking lot.

10.      Prior to the meeting with NAVARRO, CS1, CS2, and CS2's vehicle were searched for contraband and narcotics at a prearranged location, with negative results. CS1 was also provided with a concealed audio recorder to capture the conversation with NAVARRO and any potential co-conspirators. CS1 and CS2 then departed the prearranged meet location and drove in CS2's vehicle, while under constant surveillance, to the Macy's department store parking lot at River Oaks Mall.

11.      At approximately 2:30 p.m., surveillance observed CS2's vehicle arrive at the Macy's parking lot. At approximately 2:33 p.m., surveillance saw a white van with Illinois license plate 65911T, also arrive in the Macy's parking lot.[3] Surveillance observed NAVARRO exit the van and meet with CS1 at the front of the van while CS2 remained in his/her vehicle. Surveillance then observed CS1 and NAVARRO walk into the Macy's.

12.      At approximately 2:49 p.m., surveillance observed CS1 and NAVARRO exit the Macy's and walk toward the van. Surveillance then saw NAVARRO enter the driver's side of his van and CS1 enter the passenger side of the van. At approximately the same time, surveillance saw a grey Pontiac with Illinois license plate 3574228 arrive in the Macy's parking lot and park

---

[3] According to Illinois Secretary of State records, this van is registered to NAVARRO.

immediately next to NAVARRO's van. Surveillance then observed a Hispanic male, who was subsequently identified as defendant VILLAREAL, exit the driver's side of the Pontiac, reach into the rear driver's side of the Pontiac, and remove a white and red cooler from the rear seat of the Pontiac. Surveillance then observed VILLAREAL walk with the cooler to the passenger side of NAVARRO's van.

13.     According to CS1, VILLAREAL handed CS1 the red and white cooler through the passenger side window of NAVARRO's van. CS1 then opened the cooler and saw what appeared to be approximately two kilograms of cocaine. When CS1 saw the cocaine in the cooler, he/she gave the arrest signal over the transmitter and law enforcement effected the arrest of NAVARRO and VILLAREAL.

14.     Subsequent to the arrest of the defendants, law enforcement conducted a field test on the substance contained within the red and white cooler. The field test of the substance was positive for the presence of cocaine.

15.     Following his arrest, and after being advised of and waiving his *Miranda* rights, NAVARRO gave a written statement to law enforcement. In that statement, NAVARRO admitted that, on June 8, 2009, he met with CS1 in order to negotiate a cocaine transaction. He also admitted that, on June 9, 2009, after he arrived at the Macy's parking lot, he placed a telephone call to VILLAREAL because he understood VILLAREAL to be a source of supply for kilogram quantities of cocaine. Additionally, NAVARRO admitted that it was his understanding that the red and white cooler possessed by VILLAREAL contained two kilograms of cocaine. NAVARRO further admitted that VILLAREAL agreed to pay NAVARRO $500 to broker the narcotics transaction.

*Conclusion*

16.    Based on the foregoing, I submit that the foregoing evidence establishes that defendants OSCAR NAVARRO and DIEGO VILLAREAL conspired and agreed with each other and with others known and unknown to possess with intent to distribute and to distribute controlled substances, namely, in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and did aid and abet said conspiracy, in violation of Title 18, United States Code, Section 2.

ANTHONY ANGLADA
Special Agent
Drug Enforcement Administration

SUBSCRIBED AND SWORN TO BEFORE ME
this 10th day of June, 2009

HONORABLE GERALDINE SOAT BROWN
United States Magistrate Judge